**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

GLYNN LEY, Individually and on Behalf of All
Others Similarly Situated,

    Plaintiff,

                Case No. 05-CV-70737-DT

v.

VISTEON CORP. et al.,

    Defendants.

_____/

### ORDER GRANTING DEFENDANTS' MOTIONS TO DISMISS

Pending before the court is Defendants Visteon Corporation ("Visteon"), Peter

Pestillo, Michael Johnston, Daniel R. Coulson, and James Palmer's "Motion to Dismiss"

and Defendant PricewaterhouseCoopers LLP's ("PwC") "Motion to Dismiss."  These

matters have been fully briefed and the court conducted a hearing in the case on May

16, 2006.

## I.  BACKGROUND[1]

Plaintiff Glynn Ley, individually and on behalf of all others similarly situated,

("Plaintiff" or "Plaintiff Class")[2] has brought a complaint for violations of federal securities

---

[1]The facts related in this section are derived from Plaintiff's complaint and accepted as true for the purpose of this motion.  *See* Fed. R. Civ. P. 12(b)(6); *Barrett v. Harrington*, 130 F.3d 246, 251 (6th Cir. 1997) (citing *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1025 (6th Cir. 1990)).

[2]On July 20, 2005, the court granted Plaintiff's "Motion for Appointment of the Public Employees' Retirement System of Mississippi as Lead Plaintiff and Approval of its Selection of Counsel."  (7/20/05 Order at 1.)  The parties, however, continue to use Plaintiff Glenn Ley in their captions identifying the case, and the court will continue to refer to Plaintiff as though it were an natural person in this order.

laws against Defendants Visteon, PwC, Peter Pestillo, Michael Johnston, Daniel R. Coulson, and James Palmer.  Each member of Plaintiff Class purchased or otherwise acquired the securities of Visteon between June 28, 2000 and January 31, 2005 (the "Class Period").  (Pl.'s Am. Compl. ¶ 1.)  Defendant Visteon is a global supplier of automotive systems, modules and components to vehicle manufacturers and the automotive aftermarket.  (*Id.* at ¶ 30.)  Visteon originally operated as the parts division of Ford Motor Company ("Ford") from its creation in 1903 until June 28, 2000, when Ford and Visteon completed a spin-off by issuing 130 million shares of Visteon stock to Ford shareholders (the "Visteon Spin-off").  (*Id.* at ¶ 2.)  The Spin-off Prospectus ("Spin-off Prospectus" or "Prospectus"), filed by Visteon and Ford and distributed to shareholders, detailed Visteon's strategy and objectives, including the acquisition of non-Ford business.  During the Class Period, Visteon was portrayed as a "'technological leader' positioned to profitably maintain its Ford business while rapidly acquiring non-Ford clientele."  (*Id.* at ¶ 3.)  Over the course of the Class Period, Visteon's price reached a high of $21.72 on August 1, 2001.  (*Id.* at ¶ 5.)

Defendant PwC is a firm of certified public accountants "engaged by Visteon to provide independent auditing, consulting and tax services . . . during the Class Period." (*Id.* at ¶ 12.)  Defendant Peter J. Pestillo is and has been the Chairman of the Board of Directory for Visteon since July 1, 2004.  (*Id.* at ¶ 13.)  Prior to this time, Pestillo was Visteon's Chief Executive Officer.  (*Id.*)  Defendant Michael F. Johnston is and has been Visteon's Chief Executive Officer and President since July 1, 2004.  (*Id.* at ¶ 14.)  Prior to this time, Johnston was Visteon's Chief Operating Officer.  (*Id.*)  Defendant Daniel R. Coulson was, until his retirement on March 31, 2004, Visteon's Vice President and Chief

2

Financial Officer.  (*Id.* at ¶ 15.)  Defendant James Palmer is and has been Visteon's Chief Financial Officer and Executive Vice President since June 2, 2004.  (*Id.* at ¶ 16.)

Upon announcing its preliminary fourth quarter and full year results for 2004, Visteon reported errors in the company's accounting for certain benefits and income taxes.  (*Id.* at ¶ 68.)  Visteon's March 2005 Form 10-K indicated that its previously issued financial statements contained $108 million in accounting errors which "understated net losses by an excess of $60 million."  (*Id.* at ¶ 70.)  On May 10, 2005, Visteon reported errors relating to "accruals for costs principally associated with freight expenses, material surcharges and supplier expenses."  (*Id.* at ¶ 77.)  Visteon's stock price reached a low of $3.14 on May 11, 2005.  (*Id.* at ¶ 5.)  During the class period, Plaintiff alleges that Visteon shareholders lost $2.33 billion in market capitalization.  (*Id.*)

In his complaint, Plaintiff asserts three claims against Defendants.  As to Defendants Visteon, Pestillo, and Coulson, Plaintiff asserts, in Count I of his complaint, that Visteon's Spin-off Prospectus was "inaccurate and misleading, contained untrue statements of material facts, and omitted to state material facts necessary to make the statements made not misleading."  (*Id.* at ¶ 139.)  In Count II of his complaint, Plaintiff asserts a claim against all Defendants under Section 10(b) of the Exchange Act and SEC Rule 10b-5.  Specifically, Plaintiff asserts that Defendants"carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Visteon securities at artificially inflated prices" in violation of Section 10(b) of the

3

Exchange Act of 1934 and the SEC Rule 10b-5.  (*Id.* at ¶ 146.)[3]  In his third claim,

Plaintiff seeks to hold the individual Defendants liable as "controlling persons" under

Section 20(a) of the Exchange Act.  (*Id.* at ¶ 157.)

## II.  STANDARD

In ruling on a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure, the court must construe the complaint in a light most favorable to the

plaintiff, accept all the factual allegations as true, and determine whether the plaintiff

undoubtedly can prove no set of facts in support of his claims that would entitle him to

relief.  *Sistrunk v. City of Strongsville*, 99 F.3d 194, 197 (6th Cir. 1996); *Kline v. Rogers*,

87 F.3d 176, 179 (6th Cir. 1996); *Wright v. MetroHealth Medical Center*, 58 F.3d 1130,

1138 (6th Cir. 1995).  When an allegation is capable of more than one inference, it must

be construed in the plaintiff's favor.  *Columbia Natural Resources, Inc. v. Tatum*, 58

F.3d 1101, 1109 (6th Cir. 1995); *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th

Cir. 1993); *Mayer v. Mylod*, 988 F.2d 635, 638 (6th Cir. 1993).  Hence, a judge may not

grant a Rule 12(b)(6) motion based on a disbelief of a complaint's factual allegations.

*Wright*, 58 F.3d at 1138; *Columbia Natural Resources, Inc.*, 58 F.3d at 1109.

Though decidedly liberal, this standard of review does require more than the bare

assertion of legal conclusions.  *Lillard v. Shelby County Bd. of Educ.*, 76 F.3d 716, 726

---

[3]Defendants have divided Plaintiff's claim into "two principal claims": the "Spin-off Claim" (Plaintiff's allegation that Defendants "concealed facts purportedly showing that [Defendant] Visteon . . . was destined to fail because of the Company's June 2000 spin-off from the Ford Motor Company") and the "Restatement Claim" (Plaintiff's allegation that "Visteon's recent restatements of certain of its prior-period financial results demonstrates fraud").  (Defs.' Mot. at 1.)  The court finds these shorthand delineations to be appropriate and will utilize them in its analysis of Plaintiff's complaint.

(6th Cir. 1996); *LRL Properties v. Portage Metro Hous. Auth.*, 55 F.3d 1097, 1100-01 (6th Cir. 1995). The complaint should give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Gazette v. City of Pontiac*, 41 F.3d 1061, 1064 (6th Cir. 1994). "In practice, 'a . . . complaint must contain either direct or inferential allegations respecting all the material elements to sustain a recovery under *some* viable legal theory.'" *Lillard*, 76 F.3d at 726 (emphasis in original) (quoting *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988)).

As the Sixth Circuit explained in *Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001), to a large extent, the standards applicable to Rule 12(b)(6) motions to dismiss remained unchanged even after the passage of the Private Securities Litigation Act of 1995 ("PSLA"), which heightened the pleading standards for securities fraud litigation. *Id.* at 553. However, while the *Helwig* court noted the continued viability of the Rule 12(b)(6) standards in the aftermath of the PSLA, the court made clear that securities fraud complaints are subject to a more stringent 12(b)(6) scrutiny:

> [T]he Reform Act did not reverse the polarity of securities pleading. As always under Rule 12(b)(6), we will indulge plaintiffs' inferences of fraud - provided, of course, those inferences leave little room for doubt as to misconduct. . . . Inferences must be reasonable and strong-but not irrefutable. "Strong inferences" nonetheless involve deductive reasoning; their strength depends on how closely a conclusion of misconduct follows from a plaintiff's proposition of fact. Plaintiffs need not foreclose all other characterizations of fact, as the task of weighing contrary accounts is reserved for the fact finder. Rather the "strong inference" requirement means that plaintiffs are entitled only to the most plausible of competing inferences. . . . This represents a significant strengthening of the pre-PSLA standard under Rule 12(b)(6), which gave the plaintiff the benefit of all reasonable inferences," *Cameron v. Seitz*, 38 F.3d 264, 270 (6th Cir. 1994) (emphasis added), and contemplated dismissal "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Bloch*, 156 F.3d at 677 (emphasis added) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984)).

5

*Id.*

## III. DISCUSSION

### A. Defendants' Visteon, Peter Pestillo, Michael Johnston, Daniel R. Coulson, and James Palmer's "Motion to Dismiss"

#### 1. Section 11 Claim

Although Plaintiff denied Defendants' request, pursuant to E.D. Mich. L.R. 7.1(a), to dismiss Count I, and Defendants were required to move and brief their argument for dismissal, in his response to Defendants' motion Plaintiff states that he "does not oppose . . . Defendants' motion to dismiss" this claim.  (Pl.'s Resp. at 26, n. 8.) Accordingly, the court will dismiss Count I of Plaintiffs' complaint.

#### 2. Section 10(b) Claim

In Count II of his complaint, Plaintiff asserts a claim under Section 10(b) of the Exchange Act and SEC Rule 10b-5 against all Defendants.  Specifically, Plaintiff asserts that Defendants "carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Visteon securities at artificially inflated prices."  (Am. Compl. at ¶ 146.)

To state a viable claim under Section 10(b) of the Securities Exchange Act of 1934, or under SEC Rule 10b-5, "a plaintiff must allege: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury."

*City of Monroe Employees Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 668 (6th Cir. 2005) (citations omitted). "A statement is said to be 'actionable' when it satisfies the first two of these requirements, i.e., it is a misrepresentation or omission of a material fact that the defendant had a duty to disclose." *Id.* (citations omitted). "In order to be actionable, a misrepresentation or omission must pertain to material information that the defendant had a duty to disclose, two significant limitations to the general policy of disclosure." *Id.* at 669. Moreover, "in a fraud on the market case, the defendant's failure to disclose material information may be excused where that information has been made credibly available to the market by other sources." *In re Apple Computer Sec. Litig.*, 886 F.2d 1109, 1115 (9th Cir.1989).

In their motion to dismiss, Defendants assert that Plaintiff's Section 10(b) and Rule 10b-5 claim fails because "(1) [P]laintiff has failed to allege an actionable mistatement or omission to support its Spin-off Claim; (2) [P]laintiff has failed to allege facts showing that defendants knew that Visteon's prior period financial statements were incorrect when issued - - the required scienter element of its Restatement Claim; (3) [P]laintiff . . . failed to plead loss causation; and (4) the . . . claim is barred in large part by the statute of limitations." (Defs.' Mot. at 11.) Both Plaintiff's Spin-off and Restatement claims fall under this provision, and will be reviewed separately.

### a. Spin-off Claim

In his Spin-off Claim, Plaintiff asserts that Visteon did not disclose its high labor costs, the price reductions owed to Ford, and its dependence on Ford in its Prospectus. Instead, Plaintiff contends that "the market for Visteon Securities promptly digested current information regarding Visteon from all publicly-available sources and reflected

7

such information in Visteon's stock price," thereby invoking the "fraud on the market" doctrine. (Compl. at ¶¶ 135-36.) Based on Plaintiff's reliance on the fraud on the market doctrine, Plaintiff's Section 10(b) and SEC Rule 10b-5 claim will fail as a matter of law, regardless of any failure to disclose by Defendant, if it can be demonstrated that the market was aware of the truth.[4] *City of Monroe*, 399 F.3d at 676.

"In ruling on Rule 12(b)(6) motions in securities fraud actions courts can and have taken judicial notice of information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements." *In re Unumprovident Corp. Securities Litigation,* 396 F.Supp.2d 858, 876 (E.D. Tenn. 2005) (citations omitted). The court will therefore review information that was publically available to investors and the public at large to determine if the market generally was aware of Visteon's inability to shed unprofitable business lines inherited from Ford, high labor costs, price reductions owed to Ford, and reliance upon Ford.

**i. Visteon's Inability to Shed Unprofitable Business Lines Inherited From Ford**

Defendants argue that they "disclosed at the start of the class period, in the Spin-off Prospectus, that [Visteon] could not easily divest unprofitable businesses inherited from Ford." (Defs.' Mot. at 13.) In addition, Defendants maintain that "during the class period, Visteon repeatedly cautioned investors that it continued to face restrictions on its ability to exit non-performing businesses on satisfactory terms because it had limited flexibility under its existing labor agreements." (*See id.* at 13; Ex. 3, 2001 Form 8-K at

---

[4]Plaintiff's individual knowledge of such information or publications is not relevant; the only consideration is whether the public at large generally was aware of the truth. *See City of Monroe*, 399 F.3d at 675-76; *In re Apple Computer Sec. Litig.*, 886 F.2d at 1115.

2; Ex. 4, 2000 Form 10-K at 17; Ex. 5, 2001 Form 10-K at Ex. 99.1; Ex. 6, 2002 Form

10-K at Ex. 99.1; Ex. 7, 2003 Form 10-K at 37.)  Defendants also have provided

evidence in the form of published market analyst reports relating to Visteon's

unprofitable business lines inherited from Ford.  (*See id.* at Ex. 8, Bear Stearns, *V in*

*Visteon is for Value*, August 7, 2000 at 7; Ex. 9, Baird U.S. Equity Research, *New*

*Agreement with Ford*, December 22, 2003 at 2; Ex. 10, Lehman Brothers, *Visteon*

*Corp.: It Could Get Worse*, October 15, 2004 at 2.)  Defendants assert these

publications are evidence that "the market was well aware that Visteon was saddled

with unprofitable business lines inherited from Ford."  (*Id.* at 13.)

### ii.  Visteon's High Labor Costs

Defendants assert that the Spin-off Prospectus detailed the manner in which

Visteon's labor costs could impact its ability to compete.  (*Id.* at 14.)  The Prospectus

stated: "[Visteon] must increase [its] competitiveness to improve [its] operating results,

but [it] is limited in this regard by [its] labor arrangements."  (*See Id.*; Ex. 1, Prospectus

at 9, 38, 66-67, 78-79, F-28.)  Defendants maintain that "[a]s a result of these and

subsequent similar cautionary disclosures, the market was well aware throughout the

class period that Visteon had high labor costs relative to its competition."  (*Id.* at 14.)

Defendants have also included certain published analyst reports concerning the matter.

(*See id.* at Ex. 11, Joann Muller, *Maybe What's Good for GM is Good for Ford*, Bus.

Wk., April 24, 2000; Ex. 12, *Norihiko Shirouzu, Ford Sets Distribution for Visteon Spinoff*

*as Unit Looks to Life after Separation*, Wall St. J., June 5, 2000 at 2; Ex. 13, Morgan

Stanley, *There's Something Happening Here*, Dec. 3, 2003 at 3; Ex. 14, Deutsche Bank,

*Meeting with VC - Good News May Note Measure Up to Expectations*, Dec. 8, 2003 at

1; Ex. 15, Morgan Keegan, *Industrial Morning Notes - VC*, Dec. 18, 2003 at 1.)
Defendants assert these disclosures and publications informed the market of Visteon's
high labor costs.  (*Id.* at 14.)

### iii.  Price Reductions Owed by Visteon to Ford

Defendants assert that "Visteon disclosed in the Spin-off Prospectus that it owed
Ford price reductions pursuant to the terms of the Spin-Off, and that those reductions
would impede its ability to compete."  (*Id.* at Ex. 1, Prospectus at 9.)  Visteon further
asserts that "[t]he market took note of these price reductions."  (*Id.*)  Defendants point to
excerpts from several market analysts as evidence that the market took note of these
price reductions.  (*See id.* at  Ex. 8, Bear Stearns, *V in Visteon is For Value*, August 7,
2000 at 8; Ex. 16, David Sedgwick, *Identity Crisis: Visteon Seeks a New Image: Less
Ford, More Silicon Valley*, Automotive News International, October 6, 2000 at 3; Ex. 13,
Morgan Stanley, *There's Something Happening Here*, December 3, 2003 at 3.)
Defendants contend that these disclosures and publications made the market aware of
price reductions owed by Visteon to Ford.

### iv.  Visteon's General Dependence on Ford

Defendants also maintain that the Spin-off Prospectus disclosed that Visteon
would remain dependent upon Ford for the majority of its business.  (*Id.* at Ex. 1,
Prospectus, at 10.)  In addition, Defendants assert that Visteon disclosed, in each of its
annual reports, that Ford was by far Visteon's largest customer.  (*See id.* at Ex. 4, 2000
Form 10-K at 2; Ex. 5, 2001 Form 10-K at 1; Ex. 6, 2002 Form 10K at 6; Ex. 7, 2003
Form 10K at 6.)  Defendants claim that "the market took note–often in blunt terms– of
Visteon's dependence on Ford before, during, and after the alleged class period," and

10

cite several market analyst publications to support this contention.  (*Id.* at 16; Ex. 11,

Joann Muller, *Maybe What's Good for GM is Good for Ford*, Bus. Wk., April 24, 2000 at

2; Ex. 14, Deutsche Bank Securities, *Meeting with VC-Good News May Not Measure

Up to Expectations*, December 8, 2003 at 2; Ex. 17, Lehman Brothers, *Overly Optimistic

View on Ford-VC Negot*, December 3, 2003 at 2.)  Defendants assert that these

disclosures and publications made the market aware of Visteon's general dependance

upon Ford for much of its business.

### v.  Visteon's Reliance Upon Ford for Information Technology Services

Defendants assert that "Visteon disclosed in the spin-off prospectus that it would

be relying on Ford for its information technology [("IT")] services."  (*Id.* at 16; Ex. 1,

Prospectus at 77.)  Defendants further assert that "Visteon disclosed in each of its

annual reports that the Company paid Ford for IT services."  (*See id.* at 16-17; Ex. 4,

2000 Form 10-K at 37; Ex. 5, 2001 Form 10-K at 45; Ex. 6, 2002 Form 10-K at 7; Ex. 7,

2003 Form 10-K at 7.)  Defendants also cite published market analyst reports stating

that Visteon relied heavily upon Ford for IT services.  (*See id.* at 17; Ex. 18, Credit

Suisse/First Boston, *All I Want for Christmas Is a Competitive Cost Structure*, December

23, 2003 at 5; Ex. 19, Bear Stearns, *Moving in the Right Direction?*, December 23, 2003

at 2 (emphasis added).)  Defendants contend that these disclosures and publications

informed the market of Visteon's reliance upon Ford for information technology services.

### vi.  Analysis

Defendants generally assert that "all of the facts regarding Visteon's Ford-related

operational issues that [P]laintiff claims were concealed during the class period were, in

fact, disclosed by Visteon and digested by market analysts during the class period" and

11

"as a result, [P]laintiff's Spin-Off Claim fails for failure to identify an actionable misstatement or omission." (*Id.* at 17.)  Plaintiff argues that what it derisively refers to as Defendants' "truth on the market defense" is "premature" and is "not a proper basis for a motion to dismiss." (Pl.'s Resp. at 24.)  In doing so, Plaintiff asserts that the analyst reports presented by Defendant do not provide proof of the market's knowledge. (*Id.* at 25.)  The court disagrees.

The court finds that information included in the reports published by credible market analysts may be considered in this case.  *See Unumprovident Corp. Securities Litigation,* 396 F.Supp.2d at 876 ("[T]he Court sees no reason why information disseminated by third parties which might have put [a party] on notice of the alleged violation should not be considered."). Plaintiff does not dispute the genuineness of any of the articles proffered by Defendants, and the court notes that each comes from a reputable source respected for its analysis of the financial market.  The court perceives no manner in which the newspaper articles could be controverted.[5]  Therefore, the court will consider publications by market analysts in determining if the market had sufficient knowledge of Defendants' various deficiencies.

It is clear from numerous publications, both appearing in market analyst reports and in Visteon's Spin-off Prospectus, that the market was made aware of Visteon's

---

[5] Plaintiff may contend that the articles are not sufficiently accurate to be subject to judicial notice on the basis they are unauthenticated hearsay.  However, printed materials purporting to be newspapers or periodicals are self-authenticating under Rule 902(6).  *Unumprovident,* 396 F.Supp.2d at 876, citing *Woolsey v. Nat'l Transp. Safety Bd.*, 993 F.2d 516, 520-21 (5th Cir.1993) (holding magazine articles and self-promoting statements issued through press-kit and advertisements were self-authenticating under Rule 902).  A hearsay objection would be unsuccessful.

various deficiencies as an independent company.  The court will offer no finding as to

whether Defendant failed to disclose material information. Such a finding is not

necessary: "[any] failure to disclose material information may be excused where that

information has been made credibly available to the market by other sources."  *In re*

*Apple Computer Sec. Litig.*, 866 F.2d at 1115.  Because Plaintiff can be charged with

knowledge of the information contained within the news articles, *City of Monroe*, 399

F.3d at 675-76, any possible failure by Defendants to disclose material information is

excused.  Therefore, there is no set of facts that Plaintiff can prove in support of this

claim that would entitle him to relief.  *See Helwig*, 251 F.3d at 553; *Wright*, 58 F.3d at

1138.  Given the knowledge attributed to the market concerning Visteon's inability to

shed unprofitable business lines inherited from Ford, high labor costs, price reductions

owed to Ford, and general reliance upon Ford, the court will grant Defendant's Motion to

Dismiss as to Plaintiff's Spin-Off claim.

### b.  Restatement Claim

In his Restatement Claim, Plaintiff asserts that Visteon's corrections of prior-

period financial results (referred to as "restatements") demonstrate fraud and are

evidence of scienter under Section 10(b) of the Exchange Act and SEC Rule 10b-5.

Defendants maintain that Plaintiff "has failed to satisfy th[e] requirements for pleading

scienter" as "[t]he Sixth Circuit has repeatedly rejected the proposition that restatements

or accounting errors, standing alone, show scienter."  (Def.'s Mot. at 18 (citing *In re*

*Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999).)  Defendants assert that

Plaintiff's complaint "does not allege any facts giving rise to a strong inference that any

13

of the defendants knew, or were reckless in not knowing, that any of Visteon's financial statements were incorrect when issued." (*Id.*)

In response, Plaintiff asserts that "[t]he Complaint alleges that [D]efendants purposefully conspired to concoct and execute a scheme whereby Visteon was created for the purpose of shifting Ford's unprofitable businesses onto unsuspecting Visteon shareholders and furthered that scheme by falsifying over four years of financial statements." (Pl.'s Resp. at 13.) Plaintiff further contends that "[t]he Sixth Circuit has . . . recognized that an inference of scienter may be drawn from allegations of accounting violations that are so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant." (*Id.* at 15 (citing *P.R. Diamonds, Inc. v. Chandler*, 364 F.3d 671, 684-86 (6th Cir. 2004).) While this may be a correct characterization of the law, the accounting errors in the present case are not simple, basic and pervasive such that they should have been obvious. Instead, the errors corrected by the restatement, as alleged in the complaint, result from changed expense attribution periods resulting from amendments to retiree health care benefit plans, pension expenses related to special termination benefits for the European market, and complicated calculations regarding earning of foreign subsidiaries dealing with foreign currency movements against the U.S. dollar. (Am. Compl. at ¶ 50.) Based upon their explanations in the briefing, the attorneys are not easily able to decipher or describe the specifics of these accounting errors (nor is the court, it should be noted), and the court will refuse to characterize them as "so simple, basic, and pervasive in nature." *P.R. Diamonds, Inc.,* 364 F.3d at 684-86.

Further, and perhaps more important, these errors were not so great in

14

magnitude to have been "obvious." Instead, as Defendants point out, "Visteon's

accounting errors totaled 5.68 percent of its revenue during the class period." (Defs.'

Reply at 5 (citing Pl.'s Resp. at 11).)  Even assuming, *arguendo*, that these errors were

of "great magnitude," the court takes note of a recent Sixth Circuit opinion expressly

rejecting a position allowing an inference of scienter to be drawn from the magnitude of

accounting errors alone.  As the Sixth Circuit stated:

> We decline to follow the cases that hold that the magnitude of financial
> fraud contributes to an inference of scienter on the part of the defendant.
> Allowing an inference of scienter based on the magnitude of fraud "would
> eviscerate the principle that accounting errors alone cannot justify a
> finding of scienter." *In re SCB Computer Tech., Inc. Sec. Litig.*, 149
> F.Supp.2d 334, 359 (W.D. Tenn.2001); *see also In re Comshare*, 183 F.3d
> at 553 (holding that the failure to follow accounting standards "is, by itself,
> insufficient to state a securities fraud claim"). It would also allow the court
> to engage in speculation and hindsight, both of which are counter to the
> PSLRA's mandates.

*Fidel v. Farley,* 392 F.3d 220, 231 (6th Cir. 2004).

Plaintiff points to additional facts that it claims support a finding of scienter.  First,

Plaintiff asks the court to consider a March 10, 2004 "notes offering" of $450 million by

Visteon due 2014 bearing an interest of 7% per year as evidence of scienter.  (Pl.'s

Resp. at 16.)  Plaintiff alleges that Defendants' motive behind the offering was to avoid

a potential default as well as cash flow difficulties.  (*Id.*)  However, Defendants correctly

stated in their Reply that a defendant's alleged motive to avoid defaulting on loans is not

sufficient to create an inference of scienter.  (Defs.' Reply at 6 (citing *P.R. Diamonds*,

364 F.3d at 683).)  Defendant's motivation for the offering, whatever in fact it may have

been, is insufficient to prove scienter.

Plaintiff also points to Defendant Pestillo's January 23, 2003 statement that

15

Visteon has a "solid year" in 2002 as evidence of scienter because, according to Plaintiff, during internal discussions in 2002 and 2003 Visteon was described as "barely liquid." (Pl.'s Resp. at 17.) Defendants, in their Reply, assert that "Pestillo's statement that Visteon had a 'solid year' is quintessential puffing that is not actionable under Rule 10b-5." (Def.'s Reply at 6 (citing *In re Ford Motor Co. Secs. Litig.*, 381 F.3d 564, 570-71 (6th Cir. 2004).) The court agrees that the statement was "corporate optimism," and not evidence of scienter. *See Ford Motor Co.*, 381 F.3d at 570. Additionally, Visteon's liquidity constraints are not addressed in the complaint; instead, Plaintiff is concerned with Defendants' general reliance upon Ford. Therefore, the statement cannot be used to show scienter under the claim as presented.

Plaintiff contends that the signatures of Defendants Pestillo and Coulson in Visteon's 2003 Sarbanes-Oxley certification, pursuant to exchange Act Rule 13A-14(a), provides evidence of scienter. (Pl.'s Resp. at 17-18.) The certification "state[d] in part that Pestillo and Coulson ha[d] reviewed the Annual Report and that it [did] not contain any untrue statement of material fact and that the financial statements fairly present in all material respects the financial condition, results of operations and cash flows of Visteon during the reporting period." (*Id.* at 18.) As was later disclosed with the restatements, those financial statements did contain untrue statements. However, the court declines to interpret the signed certifications as evidence of scienter, as doing so would be to hold company executives strictly liable for innocent accounting mistakes. *See, cf., Comshare*, 183 F.3d at 553.[6]

---

[6]The court acknowledges the case cited by Plaintiff in his "Notice of Supplemental Authority," *In Re American Italian Pasta Co. Sec. Litig.*, 2006 WL

Plaintiff has failed to plead any facts that support a strong inference of scienter on the part of Defendants, as is required by Section 10(b) of the Exchange Act and SEC Rule 10b-5. Therefore, the court will dismiss Plaintiff's Restatement Claim.

### 3. "Controlling Person" Claim

In his final claim against Defendants, Plaintiff seeks to hold all individual Defendants liable as "controlling persons" under Section 20(a) of the Exchange Act. (Compl. at ¶ 157.) The Exchange Act provides that a "person who, directly or indirectly, controls any person liable under any provision of th[e] chapter of any rule or regulations thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). Thus, as Defendant stated in their Motion to Dismiss, the "liability of 'controlling persons' under [s]ection 20 requires primary liability of the 'controlled person.' Where plaintiffs fail to state a claim against the controlled person, the controlling person claim will fail as well. *See P.R. Diamonds*, 364 F.3d at 696-98." (Def.'s Motion at 27.)

As previously discussed, Plaintiff has failed to state a Section 10(b) and Rule 10b-5 claim against Visteon. Liability as controlling persons for each individual

---

1715168 (W.D. Mo. June 19, 2006), in which "[a]nnual reports filed with the SEC were certified by [company officers], and the members of the Audit Committee." *Id.* at *5. The Western District of Missouri stated that "in many instances, the nature of the fraud alleged is of such duration and nature that it is reasonable to infer that members of upper management were aware of it, involved in it, or were so unaware of what was happening they were discharging their duties in a reckless manner." *Id.* Importantly, the court also stated that it was "*not intending to imply* those who sign such certifications are *strictly liable* for misstatements," *Id.* at *5, n. 3. (emphasis added) and relegated such a signature to the status of "a factor that may, in appropriate circumstances, demonstrate the person certifying the pronouncement has merely 'rubber stamped the numbers' and thereby acted recklessly." *Id.* This distinction is aligned with the analysis in *Comshare.*

Defendant relies upon primary liability under this claim.  Accordingly, Plaintiff's controlling person claim will be dismissed as well.  *P.R. Diamonds, Inc. v. Chandler*, 364 F.3d at 698 ("Because the Complaint fails to state an underlying securities law violation by a controlled person, we need not address the subsequent question of whether the Individual Defendants possessed an adequate degree of control to support a Section 20(a) claim.").

### B.  Defendant PricewaterhouseCooper's "Motion to Dismiss"

To state a claim under Section 10(b) of the Securities Exchange Act and Rule 10b-5, "a plaintiff must allege, in connection with a purchase or sale of securities, the misstatement or omission[,] of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused injury."  *In re Comshare*, 183 F.3d at 548.

In its Motion to Dismiss, Defendant PricewaterhouseCoopers LLC ("PwC") asserts that "[u]nder Section 10(b), Defendant PwC can be held liable for only its own misstatements and omissions."  (Def.'s Mot. at 6.)  Defendant maintains that "Plaintiff has not alleged any PwC misstatement in Visteon's prospectus, Form 10-Qs, or earnings releases" and "does not attribute to PwC any statement in Visteon's Form 10-Qs or its earnings releases."  (*Id.* at 6-7.)  Defendant refutes Plaintiff's claim that "PwC did not comply with the GAAS [(Generally Accepted Auditing Standards)] independence requirement because it served as the 'auditor for both Ford and Visteon.'"  (*Id.* at 8.)  Defendant argues, instead, that "it is common for the same firm to perform audit work for a company and its spin-offs."  (*Id.* at 9.)  Defendant indicates that GAAS requires only that auditors remain impartial, and provides a list of companies who have shared a

common auditor with their spin offs.  (*Id.* at 9-10.)

Furthermore, Defendant asserts that it "made no attempt to hide the fact that it served as the auditor for both Ford and Visteon" and it complied "with the applicable standards governing auditing for related party transactions."  (*Id.* at 10-11.)  Defendant maintains that its "alleged failure to disclose [Defendant] Visteon's decision to maintain unprofitable product lines, inability to control labor costs, lack of information technology systems and dependence on Ford is not a GAAP [(Generally Accepted Accounting Principles)] violation."  (*Id.* at 13.)  Moreover, Defendant asserts that it had "no duty to audit for or disclose internal control weaknesses," and that Plaintiff has not alleged that PwC "acted with scienter in issuing its audit reports on Visteon's annual financial statements."  (*Id.* at 14, 16.)

In response, Plaintiff argues that merely maintaining a "relationship between PwC and Visteon supports an inference of scienter."  (Pl.'s Resp. at 16)  Moreover, Plaintiff asserts that "PwC seeks to have the ultimate issues of fact in this action adjudicated prior to Plaintiff having the opportunity to conduct any discovery and in contravention of the Supreme Court's caution that the threshold issue on a motion to dismiss 'is not whether a plaintiff will prevail but whether the claimant is entitled to offer evidence to support the claims.'"  (*Id.* at  9.) (citation omitted).

The Sixth Circuit has spoken directly on this issue in the context of reviewing a Rule 12(b)(6) dismissal, and stated:

> While it is true that motive and opportunity are not substitutes for a showing of recklessness, they can be catalysts to fraud and so serve as external markers to the required state of mind.  *Comshare* made this distinction by refusing to equate motive and opportunity with scienter but yet recognizing that facts showing each may support a strong inference of

19

> recklessness.  We reaffirm that plaintiffs cannot simply plead "motive and opportunity" as a mantra for recovery under the Reform Act.  The Act requires plaintiffs to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which the belief is formed."  15 U.S.C. § 78u-4(b)(1).  In this wash of allegations, "motive" and "opportunity" are simply recurring patterns of evidence.  We decide cases on facts, not labels.

*Helwig*, 251 F.3d 540, 550 (6th Cir. 2001).  In addition, the Sixth Circuit has held that allegations that auditors "had continual access to, and knowledge of, [the company's] confidential financial and business information" were "insufficiently concrete" to "raise a strong inference of scienter."  *P.R. Diamonds*, 364 F.3d at 695-96.  The success of Plaintiff's complaint depends entirely upon the fact of a "relationship" between two entities.  Because that position has been expressly rejected by the Sixth Circuit, the court will dismiss Plaintiff's claims against Defendant PwC.

### IV.  CONCLUSION

IT IS ORDERED that Defendants Visteon Corporations, Peter Pestillo, Michael Johnston, Daniel R. Coulson, and James Palmer's "Motion to Dismiss" [Dkt. #19] is GRANTED.

IT IS FURTHER ORDERED that Defendants PriceWaterhouseCooper LLP's "Motion to Dismiss" [Dkt. # 18] is GRANTED.


 S/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE


Dated:  August 31, 2006

20

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, August 31, 2006, by electronic and/or ordinary mail.

 S/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522